# No. 25-50144

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALLEN HOUSTON JAMES,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Brief of Defendant-Appellant**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN M. KIMMELMAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## Certificate of Interested Persons

### UNITED STATES v. ALLEN HOUSTON JAMES, No. 25-50144

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Allen Houston James,** Defendant-Appellant;

2. **Justin R. Simmons,** Interim U.S. Attorney;

3. **Margaret Leachman,** former Acting U.S. Attorney;

4. **Jaime Esparza** and **Ashley C. Hoff,** former U.S. Attorneys;

5. **Mark Frazier, Siddharth Dadhich, Mary F. Kucera, Gregory S. Gloff, Shmuel Bushwick,** Assistant U.S. Attorneys, and **Aaron J. Salter, Ashley R. Jesser, Cassidy T. Siberski, Nathaniel V. Chittick, Richard S. Shiller,** Special Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Lewis B. Gainor,** Assistant Federal Public Defender, and **Ashley A. Askari,** former Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

i

8. **Kristin M. Kimmelman,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

## Statement Regarding Oral Argument

Allen Houston James requests oral argument. He argues that his attempted murder conviction must be vacated because evidence was insufficient to prove beyond a reasonable doubt the required *mens rea*: intent to kill. Alternatively, the case must be remanded for a new trial because the jury was incorrectly instructed that wanton disregard for human life was sufficient to prove attempted murder. At minimum, Mr. James's sentence should be vacated and remanded because the district court plainly erred by applying the incorrect version of the U.S. Sentencing Guidelines Manual, in violation of the *Ex Post Facto* Clause. Oral argument would help the Court resolve these issues.

# Table of Contents

Certificate of Interested Persons........................................................ i

Statement Regarding Oral Argument.............................................. iii

Table of Authorities........................................................................ vi

Subject Matter and Appellate Jurisdiction ..................................... 1

Issues Presented for Review............................................................ 2

Statement of the Case....................................................................... 4

Summary of the Arguments ........................................................... 17

Arguments and Authorities ........................................................... 20

I.  The government presented insufficient evidence that Mr.
    James had the specific intent to kill required for
    attempted murder....................................................................... 20

    A. Standard of review. ............................................................. 20

    B. Attempted murder under 18 U.S.C. § 1113 requires
       specific intent to kill. .......................................................... 21

    C. The government failed to prove that Mr. James intended
       to kill Ms. Maness. ............................................................. 23

II. The district court plainly erred by instructing the jury that
    attempted murder could be proven by intent to act with a
    wanton disregard for human life instead of a specific
    intent to kill. .............................................................................. 27

    A. Standard of review. ............................................................. 28

    B. The district court erred in its instructions......................... 28

    C. The error was obvious.......................................................... 30

D. The obvious error meant the difference between acquittal and conviction, and the Court should exercise its discretion to remand. ....................................................... 33

III. The district court violated the *Ex Post Facto* Clause of the U.S. Constitution by using the 2023 Sentencing Guidelines Manual when it sentenced Mr. James, rather than the more favorable version in effect at the time he committed his offense. ................................................................................. 35

A. Standard of review. ............................................................. 35

B. The district court plainly erred by using the 2023 Guidelines Manual instead of the more favorable Manual in effect when the offense occurred in 2000. ........ 36

C. The plain error affected Mr. James's substantial rights because it resulted in the use of an incorrectly high Guidelines range that the district court used to anchor its above-Guidelines sentence. .......................................... 39

D. The Court should correct the error because it seriously affects the fairness, integrity, and public reputation of the judicial proceedings. .................................................... 42

Conclusion ...................................................................................... 45

Certificate of Compliance with Type-Volume Limit ...................... 46

# Table of Authorities

## Cases

*Braxton v. United States,*
  500 U.S. 344 (1991) ............................................................*passim*

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ................................................................ 21

*Molina-Martinez v. United States,*
  578 U.S. 189 (2016) ..................................................... 36, 39, 40

*Musacchio v. United States,*
  577 U.S. 237 (2016) ................................................................ 20

*Peugh v. United States,*
  569 U.S. 530 (2013) ............................................................*passim*

*Rosales-Mireles v. United States,*
  585 U.S. 129 (2018) ......................................................... 36, 43

*United States v. Beacham,*
  774 F.3d 267 (5th Cir. 2014) .................................................. 20

*United States v. Capistrano,*
  74 F.4th 756 (5th Cir. 2023) .................................................. 28

*United States v. Currie,*
  911 F.3d 1047 (10th Cir. 2018) ................................... 23, 29, 30

*United States v. Hernandez-Montes,*
  831 F.3d 284 (5th Cir. 2016) ..............................................*passim*

*United States v. Jones,*
  681 F.2d 610 (9th Cir. 1982) ..............................................*passim*

*United States v. Jones,*
  935 F.3d 266 (5th Cir. 2019) ....................................... 28, 33, 35

*United States v. Kwong,*
  14 F.3d 189 (2d Cir. 1994) ..................................................*passim*

*United States v. Maldonado-Flores*,
　734 F. App'x 285 (5th Cir. 2018) (per curiam)............................ 44

*United States v. Myers*,
　772 F.3d 213 (5th Cir. 2014) ........................................................ 44

*United States v. Parra*,
　111 F.4th 651 (5th Cir. 2024) ............................................... 40, 42

*United States v. Perez*,
　43 F.3d 1131 (7th Cir. 1994) .................................................*passim*

*United States v. Roa*,
　12 M.J. 210 (C.M.A.1982)............................................................ 22

*United States v. Sanders*,
　952 F.3d 263 (5th Cir. 2020) ................................................. 21, 27

*United States v. Sarabia-Martinez*,
　779 F.3d 274 (5th Cir. 2015) ....................................................... 40

*United States v. Shakbazyan*,
　841 F.3d 286 (5th Cir. 2016) ....................................................... 35

*United States v. Staggers*,
　961 F.3d 745 (5th Cir. 2020) ....................................................... 20

*United States v. Urbina-Fuentes*,
　900 F.3d 687 (5th Cir. 2018) ....................................................... 44

*United States v. White*,
　762 F. App'x 212 (5th Cir. 2019) (per curiam)...................... 29, 30

*United States v. Wikkerink*,
　841 F.3d 327 (5th Cir. 2016) ....................................................... 40

## Constitutional Provisions

*Ex Post Facto* Clause,
　Art. I, § 9 cl.3 ....................................................................*passim*

## Statutes

18 U.S.C. § 7(3) ........................................................................... 6

18 U.S.C. § 13 ............................................................................... 6

18 U.S.C. § 113(a) ................................................................. 23, 31

18 U.S.C. § 1111 ........................................................................ 21

18 U.S.C. § 1113 ................................................................. *passim*

18 U.S.C. § 2241 ........................................................................ 13

18 U.S.C. § 2242 ........................................................................ 13

18 U.S.C. § 3231 .......................................................................... 1

18 U.S.C. § 3297 .......................................................................... 6

18 U.S.C. § 3742 .......................................................................... 1

28 U.S.C. § 1291 .......................................................................... 1

Tex. Penal Code § 30.02(a)(1) ................................................... 13

Tex. Penal Code § 30.02(a)(3) ................................................... 13

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ....................................................... 1

Fed. R. App. P. 4(b)(2) ................................................................ 1

Fed. R. App. P. 32(a)(5) ............................................................ 46

Fed. R. App. P. 32(a)(6) ............................................................ 46

Fed. R. App. P. 32(a)(7)(B) ....................................................... 46

Fed. R. App. P. 32(f) .................................................................. 46

Fed. R. Crim. P. 52(b) ..................................................................... 36

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.11, p.s. (Nov. 1998) ........................................... 19

U.S.S.G. § 1B1.11, p.s. (Nov. 2023) ....................................... 19, 37

U.S.S.G. § 1B1.11, p.s. (Nov. 2024) ........................................... 37

U.S.S.G. § 1B1.11, p.s., cmt. (backg'd.) (Nov. 2023) ..................... 37

U.S.S.G. § 1B1.11(a), p.s. (Nov. 2023) ...................................... 36

U.S.S.G. § 1B1.11(b)(1), p.s. (Nov. 2023) .................................. 37

U.S.S.G. § 2A2.1 (Nov. 2023) ............................................... 37, 42

U.S.S.G. § 2A2.1 (Nov. 2024) ..................................................... 37

U.S.S.G. § 2A2.1(a) (Nov. 2023) ............................................ 12, 38

U.S.S.G. § 2A2.1(a)(2) (Nov. 1998) ............................................ 38

U.S.S.G. § 2A2.1(b)(1)(A) (Nov. 1998) ....................................... 38

U.S.S.G. § 2A2.1(b)(1)(A) (Nov. 2023) .................................... 38, 42

U.S.S.G. § 5G1.1(c)(1) (Nov. 2023) ............................................ 14

U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 1998) .............. 38, 42

U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 2023) .............. 14, 38

**Other Authorities**

Charles E. Torcia,
    4 Wharton's Criminal Law § 743 (14th ed. 1981) ............... 21, 30

Jens David Ohlin,
    1 Wharton's Criminal Law § 7:3 (16th ed.) ............................. 30

Rollin M. Perkins & Ronald M. Boyce,
   Criminal Law (3d ed. 1982)........................................................ 22

The Federalist No. 44 (C. Rossiter ed. 1961) (J. Madison) ........... 43

W. LaFave & A. Scott,
   2 Subst. Crim. L. § 11.3(a) (3d ed. Oct. 2024) ...................... 22, 29

William L. Clark & William L. Marshall,
   A Treatise on the Law of Crimes § 4.08 (7th ed. 1967).............. 22

9th Cir. Model Crim. Jury Instr. § 16.5 (2024)........................ 22, 30

11th Cir. Pattern Jury Instr. § O47 (2024)............................... 22, 30

## Subject Matter and Appellate Jurisdiction

1. **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court exercised jurisdiction under 18 U.S.C. § 3231.

2. **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas, entering a judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). Here, the court announced the sentence on February 26, 2025. ROA.38–39. The next day, Mr. James timely filed his notice of appeal, and the court entered the judgment. ROA.38, 855–56; *see* Fed. R. App. P. 4(b)(2) ("A notice of appeal filed after the court announces a … sentence … but before the entry of the judgment … is treated as filed on the date of and after the entry.").

## Issues Presented for Review

A jury convicted Mr. James of attempted murder based on the victim's description of an attempted rape and stabbing that occurred in 2000 at the Fort Hood Military Reservation. Even though attempted murder requires specific intent to kill, the district court instructed the jury that it need only find intent to commit "murder" and that murder could be committed by acting with callous or wanton disregard for human life. The district court then used the 2023 Sentencing Guidelines Manual instead of the Guidelines Manual in effect at the time of the June 2000 offense to calculate the Guidelines range before imposing a 200-month term of imprisonment.

1. Did the government present insufficient evidence that Mr. James had a specific intent to kill the victim?

2. Did the district court plainly err by instructing the jury that it need only find that Mr. James "intended to commit murder"—not that he intended to kill the victim—and that "murder" included unlawfully killing another human being with callous and wanton disregard for human life?

3. Did the district court plainly err by using the 2023 Sentencing Guidelines Manual when the Guidelines Manual in effect

at the time of the June 2000 offense produced a lower Guide-
lines range?

## Statement of the Case

In June 2000, a soldier at the Fort Hood Military Reservation was sexually assaulted and stabbed in her barracks. The man entered her room and forced himself on her sexually. When she fought back, he stabbed her until she relented—then he masturbated and left. She sought help and survived the incident, but the investigation went cold until DNA analysis in 2021 linked a semen stain on her mattress cover to Allen Houston James, a longtime servicemember with no criminal history. Mr. James was charged with attempted murder, and the jury found him guilty. At his February 2025 sentencing, the district court imposed a sentence of 200 months after using the 2023 version of the U.S. Sentencing Guidelines Manual to determine that the Guidelines range was 108 to 135 months' imprisonment. The 1998 version of the Guidelines Manual that was in effect when the offense occurred, however, would have cut the guidelines range in half. On appeal, Mr. James argues that (1) the government introduced insufficient evidence of the intent to kill to support the attempted murder conviction, (2) instructing the jury that attempted murder can be proven with an intent to act in wanton disregard of another's life was reversible

plain error, and (3) using the 2023 Guidelines Manual violated the *Ex Post Facto* Clause.

**The offense and investigation.** A little past 1:00 a.m. on June 18, 2000, a man entered Mary Maness's room in the Fort Hood barracks and attempted to rape her.[1] ROA.3087–88. He also stabbed her during the attack, leaving her severely injured and her mattress covered with blood. ROA.3087–88. She survived but could never identify the attacker. ROA.3087–88. As part of the investigation, officers collected samples from two semen stains on the mattress cover and from Ms. Maness's rectal swab. ROA.3088. The DNA profiles from these samples were entered into the Combined DNA Index System but returned no match at the time. ROA.3088–89. The case went cold.

Two decades later, after hiring a private company to use forensic genealogy to analyze the DNA evidence, investigators traced DNA from the mattress cover of Ms. Maness's bed to Mr. James, a longtime U.S. Army service member with no criminal history. ROA.3088, 3090, 3093. His DNA matched semen collected from a

---

[1] Ms. Maness is now known as Mary Beck, but she was referred to as Ms. Maness throughout trial. ROA.3087.

stain on Ms. Maness's mattress cover, and he could not be excluded as a contributor to the DNA from Ms. Maness's rectal swab. ROA.3088–89.

**The indictments.** In 2021, a grand jury indicted Mr. James for attempting to murder Ms. Maness with malice aforethought. ROA.41; *see* 18 U.S.C. § 7(3), 13, 1113. The government obtained a superseding indictment in 2023, due to concerns about misstatements to the initial grand jury. ROA.469, 6217. The charges were identical except that the superseding indictment also cited 18 U.S.C. § 3297, which extends the statute of limitations when DNA testing later implicates an identified person in the commission of a felony. *Compare* ROA.41, *with* ROA.469.

**Trial.** Mr. James proceeded to trial in 2024. ROA.30–31. The government's key evidence was the DNA. *See* ROA.1445. Army officers who collected evidence from Ms. Maness's room within hours of the attack described a "wet" or "fresh" stain on the mattress cover. ROA.1518, 1523, 1533, 1551, 1609. A forensic scientist testified that DNA from that wet stain was a statistical "match" for Mr. James. ROA.1959. Mr. James also could not be excluded as matching the DNA taken from Ms. Maness's rectal swab. ROA.1966. Ms. Maness testified that she had not had sexual relations with anyone

else in her room in the days before the attack and that she did not know the person who attacked her or ever have consensual sex with him. ROA.1859–60. The government argued this evidence showed that the semen was left during the offense, meaning that Mr. James was the attacker. *See* ROA.2044–45.

Ms. Maness never identified Mr. James as the person who attempted to rape her. ROA.1839. She told the jury that she did not know the attacker, had not seen him before, and had not seen him since. ROA.1839, 1859. The day after the offense, she described the man as "a tall light-skinned black man, bald head, [and] a baby face." ROA.1839; *see* ROA.1836. She also recalled that the man said he lived in "'Room 233 in these barracks.'" ROA.1844. She thought he also told her his name, but she could not remember it. ROA.1844.

Mr. James is a black man, was bald in 2000, and lived in Room 233 of different barracks. ROA.1736–37, 2451, 6440; *see* ROA.677. But Army investigators questioned Mr. James in 2000 and cleared him as a suspect because he told them he was at a bachelor party that same evening, and investigators' notes indicate they had confirmed this alibi with others. ROA.2449, 2453–54. Ms. Maness also did not identify him or anyone else as the attacker when she was

shown video footage of soldiers about six weeks after the attack. ROA.2223–24, 2265; *see* Def. Ex. 2 at 3:54.

The details of the attack came from Ms. Maness. *See* ROA.1838–66. She remembered a man opening her unlocked door at night while she was in bed. ROA.1839. He looked "like he was under the effects of something, like he was lost or confused." ROA.1839; *see* ROA.1842. He pulled his jeans down to his knees and did not have on underwear. ROA.1843. He took off her blanket, leaned in over her, and tried to kiss her. ROA.1839, 1843. She did not notice anything in his hand until he stood up; then she saw a knife. ROA.1844. She described the knife as having a "very short blade" with a curve on the back side. ROA.1844. He first used the knife to try to cut off her pants because he had trouble pulling them down. ROA.1845.

Ms. Maness said that once her pants were down, "he started trying to forced himself on me sexually, and so I started defending myself." ROA.1846. She pulled up her knees, and he stabbed her left knee twice. ROA.1846. He forced her down and got on top of her, and then he started hitting, biting, and stabbing her. ROA.1846. He hit her head a couple of times, causing her to see white and scream. ROA.1846, 1850.

After her legs were open, Ms. Maness covered her vagina and his penis with her hands. ROA.1847. The struggle continued, and he stabbed her in her right shoulder, both wrists, and in her neck. ROA.1847. Twice, he held the knife against her throat, pushing her hard enough to stop her from breathing. ROA.1848–49. He asked her, "what is more important, your life or the pussy?" ROA.1848. She responded that she had given her life to God, and she continued to resist. ROA.1848. He put the knife against her throat a second time, pressing harder. ROA.1849. He again asked, "what is more important, your life or the pussy." ROA.1849. She eventually stopped fighting and was stabbed again, the last time in her neck. ROA.1850–51. When he was on top of her, he pumped his hips as if they were having sex, but he never penetrated her vagina because he was not hard enough. ROA.1852.

Ms. Maness remembered the man masturbating, pulling up his pants, and then unsuccessfully trying to cut the mattress cover off before he left the room and closed the door behind him. ROA.1852, 1857. She counted to ten slowly, looked for her keys, and left her room to get help from building security. ROA.1852. She told the security officer, "'Someone just tried to rape me.'" ROA.1470. She sat in a chair waiting for the medics to arrive. ROA.1472, 1489.

The medical personnel who responded to the barracks were concerned that Ms. Maness could bleed out from her wounds, but they were able to put pressure on them and stem the bleeding. ROA.1640–41. After the adrenaline wore off, she remembered feeling like she was dying when she felt the pain from the attack. ROA.1854. When she got to the hospital, her neck was not actively bleeding, so Dr. Stefan Pettine examined her in surgery rather than in the emergency room. ROA.1717. He found "deep lacerations to the right shoulder; left dorsal wrist; right wrist, both front and back; and to the neck bilaterally; as well as the left interior knee." ROA.1716. The neck wounds in particular were concerning because of the proximity to the carotid artery. ROA.1716. Dr. Pettine described the injuries in the forearm, hands, and shoulder as "defense injuries" sustained when a person is trying to ward someone else off. ROA.1722. He commented that a lot of force would be required "for the stab wounds." ROA.1722.

The government presented additional evidence, including testimony from a psychologist to explain that trauma victims often experience memory loss and short clips from Mr. James's 2021 interrogation. ROA.1748–56, 1908–09, 2000–01. In those video clips, Mr. James is shown a picture of Ms. Maness and says he does not

recognize her. ROA.2000–01; *see* Gov't Ex. 180. He also denies ever having sex in barracks rooms and claims his DNA will not be found in her room. Gov't Exs. 182, 183.

After the government rested, Mr. James moved for judgment of acquittal, arguing that the evidence presented did not prove all elements of the offense beyond a reasonable doubt.[2] ROA.2030. The district court denied the motion. ROA.2031. Mr. James did not testify or present evidence. ROA.2033.

The district court instructed the jury that, to find Mr. James guilty of attempted murder, it must find that he "intended to commit murder" and completed a substantial step towards committing murder. ROA.565, 2085. The court defined "murder" as unlawfully killing another human being "with malice aforethought." ROA.564, 2084. "To kill 'with malice aforethought'" was further defined as "either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." ROA.564, 2084. Mr. James did not object to the court's instruction, which were

_____

[2] Mr. James also filed a post-verdict motion for judgment of acquittal, reasserting that the government failed to present evidence of all the elements. ROA.6625. The district court denied the motion. ROA.2174.

similar to the instructions he had proposed. *See* ROA.2023–24, 5879–80.

In closing, the government argued, "you have no doubt that this was an attempted murder." ROA.2042–43. The government focused on the number and location of stab wounds to argue that Mr. James "did an act that constitutes a substantial step toward the commission of that crime and strongly corroborates the defendant's criminal intent." ROA.2043–44. While the government argued that Mr. James "intended to commit murder," it never argued that he intended to kill Ms. Maness. ROA.2042–43. The defense's closing argument challenged the government's theory that the DNA evidence meant Mr. James was the person who committed the offense. ROA.2046–56.

The jury found Mr. James guilty. ROA.340, 2097.

**Sentencing.** A probation officer prepared a presentence report a couple of months after trial using the 2023 Guidelines Manual. ROA.3089. In that Manual, the attempted murder guideline provides that base offense level 33 applies "if the object of the offense would have constituted first degree murder"; otherwise, the base offense level is 27. U.S.S.G. § 2A2.1(a) (Nov. 2023). The initial report

applied the lower base offense level of 27. *See* ROA.2103, 3106.[3] Mr. James did not object to the Guidelines calculation in the initial report, but the government did. ROA.3106–07, 3111–13. The government argued that the object of Mr. James's offense was first degree murder, so level 33 should have been applied. ROA.3106–07. Specifically, the government argued that Mr. James's object was to commit felony murder because evidence showed that he attempted to rape Ms. Maness, a felony under 18 U.S.C. §§ 2241 and 2242, and that he entered her room without her consent, burglary under Texas Penal Code § 30.02(a)(1) and (3). ROA.3106–07.

The revised presentence report applied the higher base offense level of 33. ROA.3089, 3098. With a four-level enhancement for the victim sustaining permanent injuries to both of her arms due to the stabbing, the total offense level was 37. ROA.3090. Mr. James was in criminal history category I with no criminal history. ROA.3090. At 37/I, the report recommended an advisory Guidelines range of

---

[3] The initial presentence report is not part of the electronic record on appeal, but the government's objection and the PSR addendum describe it as applying base offense level 27. ROA.3098, 3106.

210 to 240 months' imprisonment.[4] ROA.3094; *see* U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 2023).

At sentencing, after much discussion, ROA.2114–52, the district court held that the object of the Mr. James's offense was not first degree murder, so the lower base offense level of 27 applied, ROA.2152. The court explained that it had "a problem with finding that there was an attempted murder and that he went into the room to attempt to murder someone." ROA.2129. The court said it did not "believe that at all." ROA.2130. Instead, "the intent of this case was to have sex." ROA.2130. Regarding the statement "your life or the pussy," the court explained it was "intended to be that kind of threat. But was there, at that point, an intent to actually kill her if she said 'no'? … I have a hard time with that one." ROA.2138–39.

With the four-level injury enhancement, the total offense level was 31, and the Guidelines range was 108 to 135 months' imprisonment. ROA.2155; *see* U.S.S.G. Ch.5, Pt.A (Sentencing Table (Nov. 2023).

---

[4] The range at 37/I is usually 210 to 262 months, but the high end was capped by the 20-year statutory maximum for attempted murder. *See* 18 U.S.C. § 1113; U.S.S.G. § 5G1.1(c)(1) (Nov. 2023).

The government argued for an upward variance to the statutory maximum of 240 months in light of the nature and circumstances of the offense. ROA.2160–61. The government also read Ms. Maness's victim impact statement, which highlighted the physical and mental trauma she had endured since the attack. ROA.2161–63. Mr. James maintained his silence, but defense counsel argued that his service record, volunteerism, and otherwise exemplary life warranted a sentence within the Guidelines range. ROA.2164–68. Mr. James also introduced reference letters from family and friends and certificates from his years of service and educational achievements.[5] ROA.2101.

The district court told the parties that it agreed with both of them: the statutory maximum was too severe given Mr. James's "exemplary life since the attack up to now," but the 108- to 135-month Guidelines range was too little given the "horrific aggravated assault" and "attempt to rape a person." ROA.2169. After commenting that Mr. James's case was the court's most difficult sentencing

---

[5] These materials were not included in the electronic record. Mr. James moved to supplement the record with the reference letters and a sample of the certificates.

decision to date, the court imposed a sentence of 200 months' imprisonment and three years' supervised release. ROA.2171; *see* ROA.858–59.

Mr. James appealed. ROA.855–56.

# Summary of the Arguments

## I.    The government presented insufficient evidence that Mr. James had the specific intent to kill required for attempted murder.

Attempted murder under 18 U.S.C. § 1113 requires the murder be committed with a specific intent to kill. *Braxton v. United States*, 500 U.S. 344, 351 & n.* (1991). Here, the government did not prove Mr. James had a specific intent to kill. Because Mr. James and Ms. Maness did not know each other and had no other interactions, the only evidence of intent came from Ms. Maness's description of the offense, the evidence at the scene, and her injuries. Ms. Maness described an attempted rape and stabbing with the intent to make her succumb to sexual advances. But this account did not describe an intent to kill her. Instead, after completing sexual acts, the man left while Ms. Maness was awake and observing his movements. After she counted to ten, she left her room to get help. Certainly the stabbing injuries were severe, but those injuries and Ms. Maness's description of the offense do not evince a specific intent to kill. The Court must vacate Mr. James's conviction because a reasonable jury could not find a specific intent to kill beyond a reasonable doubt.

## II.     The district court plainly erred by instructing the jury that attempted murder could be proven by intent to act with a wanton disregard for human life instead of a specific intent to kill.

The district court erred by instructing the jury that it need only find that Mr. James intended to commit murder, which could be accomplished by killing another with callous and wanton disregard for human life. The instructions misstated the law. For an *attempted* murder, specific intent to kill is required. This error was obvious. The Supreme Court, this Court, and other circuits recognize that attempted murder requires specific intent to kill. The jury was not properly guided in its deliberations, and this error meant the difference between a guilty verdict and an acquittal. Mr. James's conviction should be vacated and the case remanded for a new trial.

## III.     The district court violated the *Ex Post Facto* Clause of the U.S. Constitution by using the 2023 Sentencing Guidelines Manual when it sentenced James, rather than the more favorable version in effect at the time he committed his offense.

Mr. James was sentenced in 2025 for an attempted murder that occurred many years earlier, in June 2000. The district court used the 2023 Sentencing Guidelines Manual at sentencing, which produced a range of 108 to 135 months' imprisonment. But the 1998

Guidelines Manual in effect at the time of the June 2000 offense would have cut the imprisonment range nearly in half to 63 to 78 months. The district court's use of the newer Guidelines Manual that produced a higher sentencing range was obvious error. The Guidelines themselves clearly instruct courts to use the Manual in effect at the time of the offense in such situations, and the Supreme Court has held that sentencing a defendant under a higher Guidelines range in effect at the time of sentencing rather than the lower range in place at the time of the offense violates the *Ex Post Facto* Clause. *Peugh v. United States*, 569 U.S. 530, 533 (2013); U.S.S.G. § 1B1.11, p.s. (Nov. 2023); U.S.S.G. § 1B1.11, p.s. (Nov. 1998). This error affected Mr. James's substantial rights and warrants correction.

## Arguments and Authorities

**I.** **The government presented insufficient evidence that Mr. James had the specific intent to kill required for attempted murder.**

Mr. James was charged with attempting to murder Mary Maness. ROA.469. To convict him of this offense, the government had to prove beyond a reasonable doubt that that he intended to kill Ms. Maness. 18 U.S.C. § 1113; *see Braxton v. United States*, 500 U.S. 344, 351 (1991); *United States v. Hernandez-Montes*, 831 F.3d 284, 293 (5th Cir. 2016). Because the government failed to do so, this Court must vacate Mr. James's conviction.

### A. Standard of review.

Mr. James moved for judgment of acquittal, ROA.2031, so his sufficiency challenge is reviewed de novo. *See United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014). To determine sufficiency, the Court measures the evidence that was presented to the jury "against the *actual* elements of the offense, not the elements stated in the jury instructions." *United States v. Staggers*, 961 F.3d 745, 756 (5th Cir. 2020) (emphasis in original); *see Musacchio v. United States*, 577 U.S. 237, 233 (2016) ("A reviewing court's limited determination on sufficiency review thus does not rest on how the jury was instructed."). The Court views the evidence in a light most

favorable to the verdict and affirms if a "rational trier of fact could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). But "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Sanders*, 952 F.3d 263, 273–75 (5th Cir. 2020) (cleaned up).

## B. Attempted murder under 18 U.S.C. § 1113 requires specific intent to kill.

Murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. Attempted murder is punishable under § 1113. Because § 1113 does not specify the elements of "attempt to commit murder," they are those required for an "attempt" at common law. *See Braxton*, 500 U.S. at 351 n.* (1991). At common law, "attempt" required "a specific intent to commit the unlawful act." *Id.* Thus, "'an attempt to commit murder requires a specific intent to kill.'" *Id.* (quoting Charles E. Torcia, 4 Wharton's Criminal Law § 743, p. 572 (14th ed. 1981)).

Leading treatises agree that, "because intent is needed for the crime of attempt, … attempted murder requires an intent to bring about that result described by the crime of murder (i.e., the death

of another)." W. LaFave & A. Scott, 2 Subst. Crim. L. § 11.3(a) (3d ed. Oct. 2024); *see also* Rollin M. Perkins & Ronald M. Boyce, Criminal Law 637 (3d ed. 1982); William L. Clark & William L. Marshall, A Treatise on the Law of Crimes § 4.08 (7th ed. 1967). Indeed, this Court has recognized that "attempted murder's generic, contemporary meaning includes a *mens rea* of specific intent to kill." *Hernandez-Montes*, 831 F.3d at 293 & nn.17–21 (collecting treatises and federal cases).

While this Court does not have a pattern jury charge on § 1113, the circuits that do include as an element that the defendant intended to kill the victim. *See, e.g.*, 11th Cir. Pattern Jury Instr. § O47 (2024) ("when the Defendant took that [substantial] step, [he] [she] intended to kill the victim"); 9th Cir. Model Crim. Jury Instr. § 16.5 (2024) (similar).

Consequently, "a specific intent to kill is an essential element" of attempted murder. *United States v. Kwong*, 14 F.3d 189, 194–96 (2d Cir. 1994). Reckless indifference is not enough. *Id.*; *cf. United States v. Roa*, 12 M.J. 210, 212 (C.M.A.1982) (while "intent to inflict grievous bodily harm will allow conviction for murder, that intent will not suffice to sustain findings of guilty of attempted murder or assault with intent to murder"). Similarly, courts have held that

"reckless and wanton conduct" does not suffice to prove the intent to kill required for an assault under 18 U.S.C. § 113(a). *United States v. Perez*, 43 F.3d 1131, 1139 (7th Cir. 1994) ("An intent to act in callous and wanton disregard of the consequences to human life is not the specific intent that is a prerequisite for a § 113(a) conviction."); *see also United States v. Currie*, 911 F.3d 1047, 1054 (10th Cir. 2018); *United States v. Jones*, 681 F.2d 610, 611 (9th Cir. 1982).

Accordingly, Mr. James's conviction for attempted murder required proof beyond a reasonable doubt that Mr. James intended to kill Ms. Maness. Proof of wanton disregard for her life or an intent to cause bodily harm is insufficient.

## C. The government failed to prove that Mr. James intended to kill Ms. Maness.

The government's evidence failed to prove this critical element—the specific intent to kill. The government's evidence on intent to kill was limited to Ms. Maness's description of the offense and the injuries she sustained. "The fact that a deadly weapon was used does not ipso facto prove the specific intent." *Kwong*, 14 F.3d

at 194. And there was no evidence that Ms. Maness and Mr. James knew each other such that he had a motive to kill her.[6]

Ms. Maness described an attempted rape, an attack that evinced an intent to engage in a criminal sexual act—not an intent to kill. *See* ROA.1838–66. She remembered a man opening her unlocked door at night while she is in bed. ROA.1839. He looked "like he was under the effects of something, like he was lost or confused." ROA.1839; *see* ROA.1842. He pulled down his jeans and was not wearing any underwear. ROA.1843. He removed her blanket, leaned over her, and tried to kiss her. ROA.1839, 1843. He got on top of her and pumped his hips as if they were having sex, rubbing against her vagina, but he never penetrated because he was not hard enough. ROA.1852. She remembered him masturbating and then leaving the room. ROA.1852.

Ms. Maness described the attacker stabbing her to try to access her vagina in order to engage in sexual abuse. When he could not initially take her pants off, he used the knife to try to cut them off.

---

[6] Mr. James told investigators in 2000 and in 2021 that he did not know Ms. Maness. ROA.2000–01, 2451; *see* Gov't Ex. 180. Maness never identified Mr. James as the attacker. ROA.1839.

ROA.1845. After he got her pants down, he tried to force himself on her sexually, and Ms. Maness started defending herself. ROA.1846. She pulled up her knees, and he stabbed her left knee twice. ROA.1846. He forced her down and got on top of her, and then he started hitting, biting, and stabbing her. ROA.1846. She covered her vagina and his penis with her hands, and he stabbed in her right shoulder, both wrists, and in her neck. ROA.1847. Twice, he held the knife against her throat, pushing her hard enough to stop her from breathing. ROA.1848–49. He asked her, "what is more important, your life or the pussy?" ROA.1848–49. She responded that she had given her life to God. ROA.1848. She eventually stopped fighting but was still stabbed—the last time was in her neck. ROA.1850–51.

After the attacker masturbated and put on his pants, Ms. Maness remembers him unsuccessfully trying to cut the mattress cover off before he left the room, closing the door behind him. ROA.1852, 1857. Ms. Maness counted to ten slowly, looked for her keys, and left her room to get help from building security. ROA.1852. She told the security officer, "Someone just tried to rape me." ROA.1470. She did not claim someone tried to kill her.

The medical personnel who responded to the scene were concerned that Ms. Maness could bleed out from her wounds, but they were able to put pressure on the wounds and stem the bleeding. ROA.1640–41. Though she sustained a puncture wound in her neck that reached the bone, she was not actively bleeding from her neck when she arrived at the hospital. ROA.1716–17.

Ms. Maness sustained severe injuries. But those injuries and her description of the attack do not support a finding of specific intent to kill. As the district court recognized at sentencing, the attack evinced an intent to force Maness to commit sexual acts. *See* ROA.2130 ("the intent of this case was to have sex"). Indeed, the man told Ms. Maness, "your life or the pussy," ROA.1848—a threat to get the sexual gratification he wanted, but the court doubted whether there was "an intent to actually kill her if she said 'no.'" ROA.2138–39. In the end, the man got access to her vagina, rubbed against it as if he was having sex, masturbated, and left her alive and able to seek help. ROA.1852.

Ms. Maness was not left unconscious. She was aware of the man leaving—putting on his pants, cutting the mattress cover, and closing the door. ROA.1852, 1857. She then counted to ten and then sought help. ROA.1852. Ms. Maness's description of the offenses

and her injuries may support an intent to cause her serious bodily injury and to apply force with reckless disregard for her life, but that is not enough. *See Kwong*, 14 F.3d at 195–96; *Hernandez-Montes*, 831 F.3d at 293. Attempted murder requires a specific intent to kill, *supra* 21–23, and the government failed to prove that heightened *mens rea*.

A verdict cannot "rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Sanders*, 952 F.3d at 273. Because the evidence was insufficient to prove specific intent to kill, Mr. James's conviction must be vacated.

## II. The district court plainly erred by instructing the jury that attempted murder could be proven by intent to act with a wanton disregard for human life instead of a specific intent to kill.

Attempted murder requires a specific intent to kill. *Braxton*, 500 U.S. at 351 n.*. Yet the jury was instructed that it need only find that Mr. James intended to commit murder, which could be accomplished by killing another with callous and wanton disregard for human life. The instructions misstated the law. As a result, the jury was not properly guided in its deliberations, and Mr. James's conviction should be vacated and the case remanded for a new trial.

### A. Standard of review.

Jury instructions are generally reviewed for abuse of discretion and harmless error. *United States v. Capistrano*, 74 F.4th 756, 769 (5th Cir. 2023). Because Mr. James did not object to the instructions for the reason raised on appeal, review is for plain error. *United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019). When reviewing a plain error, the Court considers "the jury charge as a whole" and reverses only if it is left "with the substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Capistrano*, 74 F.4th at 769. This means, "to amount to plain error, the instruction "must have meant the difference between acquittal and conviction." *Id.* (cleaned up). The Court can exercise its discretion to correct the error if it "seriously affect[s] the fairness, integrity or public of judicial proceedings." *Id.*

### B.    The district court erred in its instructions.

When a statute does not specify the elements of "attempt to commit murder," they are those required for an "attempt" at common law. *Braxton*, 500 U.S. at 351 n.* (1991); *supra* 21–23. At common law, "attempt" required "a specific intent to commit the unlawful act." *Id.* Thus, "an attempt to commit murder requires a specific intent to kill." *Id.* (cleaned up); *see also* W. LaFave & A. Scott, 2

Subst. Crim. L. § 11.3(a) (3d ed. Oct. 2024); *Hernandez-Montes*, 831 F.3d at 293 & nn.17–21.

The district court's instructions here did not require a specific intent to kill. Instead, the instructions required that the jury find the "defendant intended to commit murder." ROA.565. The instructions then provided a broad definition of "murder." ROA.564–65. They provided that the elements of murder are "that a defendant unlawfully killed another human being; and that a defendant killed another human being with malice aforethought." ROA.564. The instructions continued that "'with malice aforethought' means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." ROA.564.

Thus, the district court instructed the jury that it could convict Mr. James if he intended to act with callous and wanton disregard for human life. ROA.564–65. This falls short of the required instruction: intent to kill. *See, e.g.*, *Kwong*, 14 F.3d at 194–96; *Currie*, 911 F.3d at 1054; *Perez*, 43 F.3d at 1138; *Jones*, 681 F.2d at, *United States v. White*, 762 F. App'x 212, 213 (5th Cir. 2019) (per curiam) (for "attempted second-degree murder, the Government must prove defendant had the specific intent to kill").

### C.    The error was obvious.

When a statute does not specify the elements, the common law definition applies. *Braxton*, 500 U.S. at 351 n.* It is well settled that the mental state required for the crime of attempt is the specific intent to commit the underlying crime. *Braxton*, 500 U.S. at 351 n.*; Jens David Ohlin, 1 Wharton's Criminal Law § 7:3 (16th ed.) (Westlaw database CRIMLAW, updated Aug. 2024).

Section 1113 does not specify the elements of attempted murder. Under common law, the crime of attempted murder requires a specific intent to kill. *Braxton*, 500 U.S. at 351 n.*; *see also* 1 Wharton's Criminal Law § 7:3. Indeed, this Court held that the generic definition of attempted murder requires the specific intent to kill and that wanton disregard for human life was insufficient. *Hernandez-Montes*, 831 F.3d at 293; *see also White*, 762 F. App'x at 213. Other circuits agree. *See Kwong*, 14 F.3d at 194–96 (2d Cir.); *Currie*, 911 F.3d at 1054 (10th Cir.); *Perez*, 43 F.3d at 1138 (7th Cir.); *Jones*, 681 F.2d at 611 (9th Cir.); *see also* 9th Cir. Model Crim. Jury Instr. § 16.5; 11th Cir. Pattern Jury Instr. § O47. Thus, instructing the jury that an intent to act in wanton disregard for human life was sufficient to find Mr. James guilty of attempted murder, instead of requiring a finding he intended to kill Ms. Maness, was obvious error.

Courts have held instructions to be erroneous in these circumstances. In *Kwong*, the district court instructed the jury that it "must find that the defendant acted consciously with the intent to kill another person" but then stated that "the requirement of proof of intent to kill another person would be satisfied if the government proved a reckless and wanton course of conduct on the part of the defendant." 14 F.3d at 196. Thus, like the instruction given in Mr. James's case, the *Kwong* instruction incorrectly told the jury that reckless and wanton course of conduct was enough for attempted murder. *See* ROA.564–65. The Second Circuit held that the error was not harmless beyond a reasonable doubt. 14 F.3d at 195.

Both the Seventh and the Ninth Circuits have reversed convictions for 18 U.S.C. § 113(a)—assault with intent to commit murder—because of similarly incorrect instructions on "intent to commit murder." *See Perez*, 43 F.3d at 1137–38; *Jones*, 681 F.2d at 611. In *Perez*, after determining that common law definitions apply because § 113(a) itself—like § 1113—does not list its elements, the Seventh Circuit noted that "courts of appeals have uniformly required that specific intent be proven under § 113(a)." 43 F.3d at 1138. Considering this matter "well settled," the court then turned to the jury instructions. *Id.* The "malice aforethought" instruction

31

stated that "the government must prove that Mr. Perez 'acted consciously, with the intent to kill' the victim" but also that "the government need not prove Mr. Perez' 'subjective intent to kill'—a showing of 'reckless and wanton conduct' was sufficient." 43 F.3d at 1138. After reviewing *Braxton*, *Kwong*, and *Jones*, the court held the "error was clear under current law." *Id.* at 1130.

And the error in *Jones* was identical to the error here. The trial court instructed the jury that the requisite element was the "intent to commit murder," but the instruction "became misleading when coupled with other instructions defining the separate offense of murder." *Jones*, 681 F.2d at 611. The instructions, like the ones given here, ROA.564–65, defined "murder as an unlawful killing of a human being with malice aforethought and defined malice aforethought as either an intent to take the life of another or an intent to act willfully in callous and wanton disregard of the consequences to human life." *Id.* The Ninth Circuit held that "acting with malice by committing a reckless and wanton act without also intending to kill the victim is not sufficient for conviction" and reversed the conviction. *Id.*

Given precedent from the Supreme Court and this Court, supported by treatises and other circuits' decisions and jury instructions, the instructional error was obvious in Mr. James's case.

### D. The obvious error meant the difference between acquittal and conviction, and the Court should exercise its discretion to remand.

Here, the error affected Mr. James's substantial rights. To establish this, Mr. James must "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different[.]" *Jones*, 935 F.3d at 272 (reversing conviction based on plain-error jury instruction).

As explained in detail above, *supra* 23–27, the government presented insufficient evidence of a specific intent to kill. But the evidence was closer on whether he acted with wanton disregard for human life. Notably, the government never argued to the jury that it had presented proof of intent to kill. *See* ROA.2042–43. Particularly given the district court's comments at sentencing that it did not believe that Mr. James intended to kill Ms. Maness, ROA.2129–30, 2138–39, there is a real risk that the jury convicted Mr. James based on the incorrect instructions.

Other circuits have remanded for new trial when the jury was instructed incorrectly as to intent to kill. In *Perez*, the Seventh

Circuit held that a similar misstatement of law was obvious and affected Perez's substantial rights and warranted reversal. 43 F.3d at 1139. The court explained, "[o]n the record before us, the jury, following the 'malice aforethought' instruction given by the district court, could have concluded that Mr. Perez was guilty of wanton and callous acts that showed no regard for [the victim's] life—without having a specific intent to murder him." *Id.* at 1139–40. Rather, the jury "could have believed that he attacked with the intention of teaching [the victim] a lesson, or of maiming but not killing him." *Id.* at 1140. Thus, the instruction "could well have had an unfair prejudicial impact on the jury's deliberations." *Id.*

The Ninth Circuit also held that "[t]he jury may have believed Jones' story and found a specific intent to kill absent, but nevertheless found him guilty because they determined that his attack amounted to wanton conduct." *Jones*, 681 F.2d at 612 (reversing because instructional error on § 113(a) not harmless); *see also Kwong*, 14 F.3d at 195 ("We are unable to say that the guilty verdict rendered here was surely unattributable to the error.").

This Court should reverse here because the instructional error meant the difference between conviction and acquittal. "[B]ecause the 'murder with malice aforethought' instruction did not require

proof of specific intent, but rather stated that a 'subjective intent to kill' need not be proven, and that reckless and wanton conduct would suffice, the error affects the integrity of the proceeding itself." *Perez*, 43 F.3d at 1140. Declining to correct the serious error here would "cast significant doubt on the fairness of the criminal justice system." *Jones*, 935 F.3d at 271 (cleaned up).

**III. The district court violated the *Ex Post Facto* Clause of the U.S. Constitution by using the 2023 Sentencing Guidelines Manual when it sentenced Mr. James, rather than the more favorable version in effect at the time he committed his offense.**

The district court used the 2023 Guidelines Manual when sentencing Mr. James. That was error, because the 1998 Guidelines Manual in effect at the time of the June 2000 offense would have recommended a much lower sentencing range. The court's error of using the later, more punitive Guidelines Manual is clear, affected Mr. James's substantial rights, and warrants correction.

### A. Standard of review.

This Court reviews a district court's interpretation and application of the Sentencing Guidelines, as well as constitutional challenges to the Guidelines' application, de novo. *United States v. Shakbazyan*, 841 F.3d 286, 289 (5th Cir. 2016). But because Mr.

James did not object to the use of the 2023 Guidelines Manual, review is for plain error. *See* Fed. R. Crim. P. 52(b). To prevail, Mr. James must show there was (1) an error, (2) that is clear or obvious, (3) that affected his substantial rights, and (4) that seriously affects the fairness, integrity, and public reputation of the proceedings. *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). "In the ordinary case, as here, the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018).

## B. The district court plainly erred by using the 2023 Guidelines Manual instead of the more favorable Manual in effect when the offense occurred in 2000.

Generally, the district court must "use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a), p.s. (Nov. 2023).[7] But "[i]f the court determines that use

---

[7] New Guidelines Manuals usually take effect on November 1 of each year. Thus, when Mr. James was sentenced in February 2025, the 2024 Guidelines Manual was in effect. However, the PSR, which the district court adopted, used the 2023 Guidelines Manual. ROA.2154, 3089, 3115.

of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1), p.s. (Nov. 2023). The *Ex Post Facto* Clause is violated if "a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Peugh v. United States*, 569 U.S. 530, 533 (2013); *see* U.S.S.G. § 1B1.11, p.s., cmt. (backg'd.) (Nov. 2023).

Here, the 2023 version of the Guidelines Manual that was applied at sentencing recommended a higher Guidelines range than the 1998 Manual in effect at the time of Mr. James's offense in June 2000.[8]

- Under the 2023 Guidelines Manual, the applicable base offense level for assault with intent to commit murder was 27,

---

For that reason, when citing the Guidelines provisions applied by the district court, Mr. James cites the 2023 Manual. Regardless, the relevant portions of the 2023 and 2024 Manuals—policy statement § 1B1.11 and guideline § 2A2.1—are identical.

[8] There was no 1999 Guidelines Manual, so the 1998 Manual was still in effect in June 2000.

"if the object of the offense would have constituted first degree murder." ROA.2151; *see* U.S.S.G. § 2A2.1(a) (Nov. 2023). Under the 1998 Guidelines Manual, the applicable base offense level for that same offense was 22. U.S.S.G. § 2A2.1(a)(2) (Nov. 1998).

- Both versions of the Manual called for a four-level enhancement "if the victim sustained permanent or life-threatening bodily injury." U.S.S.G. § 2A2.1(b)(1)(A) (Nov. 2023); U.S.S.G. § 2A2.1(b)(1)(A) (Nov. 1998); *see* ROA.3090. So Mr. James's total offense level under the 2023 Manual was 31. Under the 1998 Manual, by contrast, it would have been 26.

- Under both versions of the Manual, Mr. James was in criminal history category I because he had no criminal history. U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 2023); U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 1998).

- Under the 2023 Manual, Mr. James's Guidelines range—at 31/I—was 108 to 135 months' imprisonment. *See* ROA.2151, 3115; U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 2023). Under the 1998 Manual, the range—at 26/I—would have been 63 to 78 months' imprisonment. *See* U.S.S.G. Ch.5, Pt.A (Sentencing Table) (Nov. 1998).

In short, application of the more punitive 2023 Guidelines Manual almost doubled Mr. James's Guidelines range. That was error that is clear and obvious given both Manuals' unambiguous instruction to apply the version in effect at the time of the offense if applying the one in effect at sentencing would violate the *Ex Post Facto* Clause. U.S.S.G. § 1B1.11(b)(1), p.s. (Nov. 2023); U.S.S.G. § 1B1.11(b)(1), p.s. (Nov. 1998). Using the newer Guidelines Manual here obviously violated the *Ex Post Facto* Clause because it nearly doubled Mr. James's Guidelines range. *See Peugh*, 569 U.S. at 533.

## C. The plain error affected Mr. James's substantial rights because it resulted in the use of an incorrectly high Guidelines range that the district court used to anchor its above-Guidelines sentence.

Under the third prong of plain error review, a defendant must show that the error affected his substantial rights. *Molina-Martinez*, 578 U.S. at 194. That is, a defendant "must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (cleaned up). In the context of an error in the Sentencing Guidelines calculation, that means "a reasonable probability that, but for the district court's misapplication of the Guidelines, the defendant would have received a lesser

sentence." *United States v. Sarabia-Martinez*, 779 F.3d 274, 278 (5th Cir. 2015) (cleaned up).

The Supreme Court has instructed that, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198. This is because, "in the normal course, a non-Guideline sentence still uses the Guidelines range as a reference point." *United States v. Parra*, 111 F.4th 651, 662 (5th Cir. 2024) (quoting *United States v. Wikkerink*, 841 F.3d 327, 337 (5th Cir. 2016)). Unless the case involves "unusual circumstances," a defendant "will not be required to show more." *Molina-Martinez*, 578 U.S. at 201.

There are no unusual circumstances here. Even though Mr. James was sentenced above the Guidelines range, most of the sentencing hearing was devoted to resolving a dispute over the correct base offense level. *See* ROA.2114–54. Ultimately, the district court determined what it believed was the correct Guidelines range: 108 to 135 months. ROA.2155. The court then "use[d] the sentencing

range as the beginning point to explain the decision to deviate from it." *Peugh*, 569 U.S. at 542 (cleaned up); *see* ROA.2169.

The district court acknowledged that fashioning a sentence for Mr. James was exceedingly difficult. ROA.2171. Mr. James argued for a sentence within the Guidelines range, and the government argued for the statutory maximum of 240 months. ROA.2158, 2168. The court told the parties that neither of them was correct. ROA.2169. The court explained that it was imposing a sentence outside the Guidelines range because of "the history and characteristics of the defendant on a mitigation side, but the seriousness and nature and the circumstance of this offense … on the aggravating side." ROA.2169–70. The court recognized that the victim was "horribly affected by this" but also that Mr. James had lived an "exemplary life since the attack." ROA.2170.

After referencing the Guidelines range of 108 to 135 months and the 240-month statutory maximum as its reference points, the district court then ordered Mr. James to be imprisoned for 200 months. ROA.2169–71. Thus, even when the court decided to vary from the Guidelines, the court "use[d] the sentencing range as the beginning point," so "the Guidelines are in a real sense the basis for the sentence." *Peugh*, 569 U.S. at 542 (cleaned up). The court did not

explain that the 200-month sentence is one it would have selected regardless of the Guidelines range. Instead, the court determined that the lower base offense level applied but then imposed a sentence just shy of the 210-to-240-months Guidelines range that the higher base offense level would have produced under 2023 Guidelines. Had the court used the correct Guidelines Manual, the beginning point would have been about four years lower: 63 to 78 months. *See supra* 38.[9]

Here, the district court's remarks at sentencing make clear that the it "tethered the sentence imposed to the Guidelines." *Parra*, 11 F.4th at 662; *see Peugh*, 569 U.S. at 549; ROA.2169. Thus, the Guidelines error affected Mr. James's substantial rights.

### D. The Court should correct the error because it seriously affects the fairness, integrity, and public reputation of the judicial proceedings.

In the circumstances of this case, the Court should exercise its discretion to correct the error. In the "ordinary case," a plain

---

[9] Even the 1998 Guidelines range from the higher base offense level would have been much lower than its 2023 counterpart: 121 to 151 months instead of 210 to 240 months. *See* U.S.S.G. § 2A2.1(a)(1), (b)(1)(A) (Nov. 1998); U.S.S.G. Ch.5, Pt.A (Sentencing Table) (at total offense level 32 and criminal history category I).

Guidelines error that also affects a defendant's substantial rights "will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles*, 585 U.S. at 145. That is because of the "role the district court plays in calculating the range and the relative ease of correcting the error." *Id.* at 140. A brief resentencing will "provid[e] certainty and fairness" here, particularly since the decades between the offense and the prosecution disadvantaged Mr. James's ability to investigate defensive theories given that potential witnesses' memories had faded, potential witnesses could not be found, and reports and videos that should have been in the case file were not. *See* ROA.908–10.

Moreover, this was more than simply an error in applying the Sentencing Guidelines. It was a violation of the constitutional prohibition against the enactment of an "*ex post facto* Law." *Peugh*, 569 U.S. at 538 (quoting Art. I, § 9 cl.3). "The Framers considered *ex post facto* laws to be 'contrary to the first principles of the social compact and to every principle of sound legislation.'" *Id.* at 544 (quoting The Federalist No. 44, p. 282 (C. Rossiter ed. 1961) (J. Madison)). Thus, reversal here would support the "principles of fundamental justice" reflected in the *Ex Post Facto* Clause. *Id.* at 546 (cleaned up).

Indeed, the Court has vacated sentences and remanded for re-sentencing in other cases raising *ex post facto* Guidelines arguments on plain error review. *See, e.g.*, *United States v. Maldonado-Flores*, 734 F. App'x 285, 286 (5th Cir. 2018) (per curiam). In *United States v. Urbina-Fuentes*, the Court remanded partly due to the "size of the sentencing disparity at stake": a gap of three months between the two ranges. 900 F.3d 687, 699 (5th Cir. 2018). In *United States v. Myers*, the Court found that the error satisfied the third and fourth prongs of plain error review because the newer Guidelines Manual increased the sentencing range by 41 to 51 months. 772 F.3d 213, 219 (5th Cir. 2014). The Court should also exercise its discretion to vacate and remand here, given that the use of the newer, more punitive Guidelines Manual increased Mr. James's Guidelines range by approximately four years.

## Conclusion

For these reasons, the Court should vacate Mr. James's conviction or, alternatively, vacate his sentence and remand for resentencing using the 1998 Guidelines Manual.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,777 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook for the body, and 13-point Century Schoolbook for footnotes.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

Dated: August 11, 2025